

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-11-00444-CR

DERRICK LYNN LEWIS, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 27th District Court
Bell County, Texas[1]
Trial Court No. 63971, Honorable Joe Carroll, Presiding

May 29, 2013

## OPINION ON MOTION FOR REHEARING

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

By opinion and judgment dated April 17, 2013, this Court affirmed the capital murder conviction and sentence of life without parole of Appellant, Derrick Lynn Lewis. By motion for rehearing, Appellant asserts the issue raised by his supplemental brief was not disposed of by our earlier opinion, as required by Rule 47.1 of the Texas Rules

---

[1]Originally appealed to the Third Court of Appeals, this appeal was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001 (WEST 2005). We are unaware of any conflict between precedent of the Third Court of Appeals and that of this Court on any relevant issue. TEX. R. APP. P. 41.3.

of Appellate Procedure.[2]   That issue challenges the constitutionality of his sentence under *Miller v. Alabama*, 567 U.S. __, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), a decision handed down by the United States Supreme Court subsequent to the filing of his original brief.  His motion does not challenge this Court's disposition of his original three issues.  Having considered the merits of his supplemental issue, we grant the motion for rehearing,[3] withdraw our original opinion and judgment, and issue this opinion in lieu thereof.

By his original brief, Appellant maintains (1) the trial court erred in allowing the State's witness to testify after a violation of Rule 614 of the Texas Rules of Evidence, (2) the evidence is legally insufficient to support his conviction when the indictment alleges retaliation against a person other than the victim of the murder as the aggravating circumstance and (3) the trial court erred in admitting the State's computer generated animation.  By his supplemental brief, he contends his sentence of life without parole is unconstitutional.  We affirm the conviction, but reform the punishment to delete the phrase "without parole."  As reformed, the trial court's judgment is affirmed.

## BACKGROUND FACTS

On Friday, August 22, 2008, Constable Thomas Prado was at the Emerald Green Apartments searching for Appellant.  The apartment manager, Jamie Lujan, and a maintenance worker, Mark Jimenez, informed Prado that Appellant could be located at apartment 214 of the Beverly Arms Apartments, an adjoining complex.  Although

---

[2]It is within the sound discretion of the appellate court whether to consider new issues raised in a supplemental or amended brief.  *See Rochelle v. State*, 791 S.W.2d 121, 125 (Tex.Crim.App. 1990).

[3]The State was invited to respond to Appellant's motion for rehearing but did not do so.  *See* TEX. R. APP. P. 49.2.

Appellant was not at that apartment, Jimenez later pointed out a vehicle driven by Andre Hamilton, in which Appellant might be a passenger, and Prado waved down that vehicle. Although Appellant was not in the vehicle, a passenger, Montreal Wright, was arrested on an outstanding warrant and for carrying a pistol. According to witnesses, Appellant was extremely upset over Wright's arrest.

When Jimenez left work that day, he was at a stop sign when four males made threatening gestures towards him. He called Lujan and told him he would not be coming back to work. Lujan assured him it would be "okay" to return and he did so the following Monday. After returning to work Jimenez noticed an individual, later identified as Appellant, following him around for a few days while he was picking up the grounds. Because Appellant, Hamilton and others were angry with Jimenez for pointing out Hamilton's vehicle, which had led to Wright's arrest, they conspired to "get" Jimenez. There was conflicting testimony on whether "getting" him meant shooting him or beating him.

On August 28, 2008, Jimenez arrived at work at 7:50 a.m. and Lujan was already in the office. They noticed a male, later identified as Anthony Thomas, walk by the office. Thomas had been previously banned from the complex. Jimenez left the office to do some work at a nearby apartment complex. Approximately twenty minutes later, he heard an ambulance.[4] When he returned to the apartment complex, he observed the ambulance as well as police cars. He was told the manager had been shot and saw

---

[4]Lujan called 911 at 8:28 a.m. to report that he had been shot.

3

Lujan being carried out on a stretcher. Lujan suffered five gunshot wounds and on September 1, 2008, he died as a result of those wounds.

Yolanda Evans, a tenant at the Beverly Arms Apartments, testified that she was looking out her window on the morning of the shooting when she observed Appellant, Hamilton and Thomas cover their faces with bandanas while standing outside the manager's office at the Emerald Green complex.[5] Soon thereafter, she heard gunshots, followed by three individuals running from the area. Lakeisha Davis, a tenant at the Beverly Arms Apartments, testified she heard a noise and looked out her window and saw Appellant, Hamilton and Thomas running up the stairs of the Beverly Arms complex. Thomas was carrying a black bag.[6] Another witness testified that she was working on her car when she heard shots and later saw the suspects run into apartment number 112 where Thomas's cousin lived. Thomas's cousin testified that shortly after hearing gunshots, Appellant and Hamilton entered his apartment and Thomas showed up not long thereafter.

Numerous officers arrived at the scene. After interviewing witnesses, they determined the suspects were holed-up in an apartment at the Beverly Arms. After SWAT arrived, an officer trained as a negotiator was able to convince the three suspects to come out of the apartment and they were arrested. They were identified as Appellant, Hamilton and Thomas.

---

[5]Most witnesses were tenants of the Beverly Arms and from their windows could see the back of the Emerald Green Apartments. An alley separated the two complexes.

[6]There was confusion among different witnesses on whether all three suspects ran up the stairs or whether Thomas ran upstairs to hide the black bag before returning downstairs to join Appellant and Hamilton in apartment number 112.

On the morning of the shooting, Inga McCook, Thomas's girlfriend, was cleaning when she heard a boom similar to a dumpster lid closing. She went to look out her window and saw Thomas carrying a black bag. Suddenly, she realized that Thomas was in her apartment and he told her, "[t]hey shot him. They shot . . . the [racial slur]." She ordered him out of her apartment. When he left her apartment, Thomas did not have the black bag on his person.

McCook also testified that Thomas called her from jail to tell her he had hidden the black bag in a Christmas tree box in her bedroom closet. She found the bag, discovered it had two guns inside and drove down a country road to dispose of them. When she returned to her apartment, investigators were waiting to question her and she eventually led them to the area where she had tossed the guns.

Appellant, Hamilton and Thomas were each tested for gunshot primer residue. An expert testified that a classic primer mixture consists of three compounds and a particle of primer residue can contain one, two or all three of those compounds. He further testified that a particle that contains all three compounds usually results from the discharge of a firearm. The policy of the Texas Department of Public Safety is that any gunshot primer residue collected more than four hours after a shooting is usually not analyzed because too much time has passed. An exception is made when a district attorney requests testing. However, under those circumstances, interpretations are not drawn from the results.

In the underlying case, Appellant's gunshot primer residue test was conducted within the four hour window. Test results were consistent with him having recently fired

a weapon, being nearby when a weapon was fired or contacting some surface with gunshot primer residue on it. Results from the gunshot residue collected from Thomas, which was also timely obtained, did not show any gunshot primer residue particles on his hands, but some was detected on the pocket of his shorts. Hamilton's test was not conducted within the four hour window; however, his results were consistent with him having fired a weapon or having been in the proximity to or touching a weapon that had been fired. Due to the time frame issue, the expert did not draw any conclusions from those results.

Thomas originally agreed to testify against Appellant and Hamilton at their trials in exchange for an offer to plead guilty to a lesser included offense. Following this development, the State moved to jointly try Appellant and Hamilton. The trial court granted that motion and they were subsequently tried together in the same proceeding. Eventually however, at Thomas's plea hearing, he withdrew from his plea bargain and instead entered a plea of guilty to the offense of capital murder. He testified that he initiated the shooting and "it just wouldn't seem right blaming two individuals that absolutely had, you know, nothing to do with the whole situation, sir." At trial, an excerpt from Thomas's plea hearing was offered into evidence; however, the State's objection was sustained. It was subsequently introduced by the defense for purposes of appeal.

## PROCEDURAL HISTORY

On the date the offense was committed, appellant was sixteen years of age. He was originally detained as a juvenile pursuant to applicable provisions of the Texas

Family Code, but was subsequently certified to be tried as an adult. *See* TEX. FAMILY CODE ANN. § 54.02 (WEST SUPP. 2012). An order transferring jurisdiction to a criminal district court was entered on November 4, 2008.

## ANALYSIS

### ISSUE ONE – VIOLATION OF "THE RULE" OF WITNESSES

By his first issue, Appellant alleges the trial court abused its discretion in admitting the testimony of State witnesses Lakeisha Davis and Byronishia Moore after they violated "The Rule" of witnesses, Rule 614 of the Texas Rules of Evidence. We disagree.

Rule 614 provides that at the request of a party or on its own motion, the trial court may exclude witnesses to prevent them from hearing testimony of other witnesses. TEX. R. EVID. 614. A violation of the rule is not in itself reversible error, but only becomes so where the objected-to testimony is admitted and the complaining party is harmed. *Webb v. State*, 766 S.W.2d 236, 239-240 (Tex.Crim.App. 1989). Two criteria that have been suggested for determining injury or prejudice are (1) whether the witness actually conferred with or heard testimony of other witnesses and (2) whether the witness's testimony contradicted testimony of a witness from the opposing side or corroborated testimony of a witness he or she had conferred with or heard. *Bell v. State*, 938 S.W.2d 35, 50 (Tex.Crim.App. 1996) (citing *Webb*, 766 S.W.2d at 240). It is within the trial court's discretion whether to exclude testimony for a violation of Rule 614. *Webb*, 766 S.W.2d at 240.

During a hearing outside the jury's presence, the State questioned Davis and Moore about a conversation that occurred in a motel room after Wright's arrest about "getting" Jimenez. During her testimony, Moore refused to answer numerous questions posed by the prosecutor. When the prosecutor requested a break, Moore was permitted to leave the stand and sit outside the courtroom. Unbeknownst to the court, during the break, Moore and Davis conferred about questions the prosecutor was asking when a deputy overheard them and separated them.

After the trial court had already overruled several hearsay and confrontation objections, that Davis's and Moore's testimony was admissible, it came to defense counsel's attention that Rule 614 may have been violated and counsel for both defendants requested the trial court explore the violation. The deputy who overheard the witnesses testified that all he heard was one of them say, "[t]hat's what they had asked me as well." The trial court questioned Davis about her conversation with Moore. She claimed they did not discuss anything other than the manner in which the State repeatedly asked the same question in different ways. The trial court did not see a need to question Moore.

Defense counsel moved to exclude both witnesses from testifying. The State responded that the witnesses were not really discussing their testimony, only the manner of questioning. Agreeing with the State, the trial court felt that if a violation occurred, it was harmless. Both Appellant and Hamilton objected to the ruling.

Once the jury returned, Davis and Moore testified. Davis testified that she told the police two months after the shooting that Appellant, Hamilton, Thomas and another

8

individual identified as C.J. talked about "getting" Jimenez. During cross-examination, however, she could not recall whether Hamilton was involved in the discussion and was evasive on questions concerning a conspiracy to get Jimenez. Moore testified there was a conversation about beating up Jimenez but could not recall who said what or who was present during the discussion. She denied there was a conversation about killing Jimenez.

During the questioning to determine whether Rule 614 had been violated, the defense did not produce any evidence that Davis and Moore conferred about each other's testimony. Neither was there any evidence that their testimony contradicted the testimony of a defense witness or that their testimony corroborated each other's. We conclude the defense failed to establish a violation of Rule 614 and the trial court did not abuse its discretion in admitting the testimony of Davis and Moore. Issue one is overruled.

### ISSUE TWO -- LEGAL SUFFICIENCY OF THE EVIDENCE

By his second issue, Appellant maintains the evidence is legally insufficient to support his conviction for capital murder when the indictment alleges retaliation against a person other than the victim of the murder as the aggravating circumstance elevating the offense of murder to capital murder. We disagree.

The only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 33 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Brooks v. State*, 323 S.W.3d 893,

9

912 (Tex.Crim.App. 2010). Under that standard, in assessing the sufficiency of the evidence to support a criminal conviction, this Court considers all the evidence in the light most favorable to the verdict and determines whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 912. We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). In our review, we must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). We must give deference to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).

A person commits capital murder if he commits murder as defined in section 19.02(b)(1) and intentionally commits the murder in the course of committing or attempting to commit, among other offenses, the offense of retaliation. TEX. PENAL CODE ANN. § 19.03(a)(2) (WEST SUPP. 2012). A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* at § 19.02(b)(1). *See Adames v. State*, 353 S.W.3d 854, 861-62 (Tex.Crim.App. 2011), *cert. denied*, 2012 U.S. LEXIS 2268, 132 S.Ct. 1763, 182 L.Ed.2d 533 (2012). A person commits retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as an

10

informant. TEX. PENAL CODE ANN. § 36.06(a)(1)(A) (WEST 2011). An informant is a person who has communicated information to the government in connection with any governmental function. *Id.* at 36.06(b)(2).

By amended indictment, Appellant was charged with intentionally causing the death of Jamie Lujan . . . in the course of committing or attempting to commit the offense of retaliation against Mark Jimenez. The charge instructed the jury on transferred intent, the law of parties and criminal responsibility for conduct of another as follows:

> [a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that:
>
> > (1) a different offense was committed; or
> >
> > (2) a different person or property was injured, harmed or otherwise affected.
>
> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.
>
> Each party to an offense may be charged with commission of the offense.
>
> A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.
>
> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*See* TEX. PENAL CODE ANN. §§ 6.04(b), 7.01(a) & (b), 7.02(a)(2) & (b) (WEST 2011).

Conspiracy requires an agreement with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and the person or one or more of them performs an overt act in pursuance of the agreement. *See* TEX. PENAL CODE ANN. § 15.02(a) (WEST 2011). The essential element of conspiracy is the agreement to commit the crime. *Williams v. State*, 646 S.W.2d 221, 222 (Tex.Crim.App. 1983). A person may be guilty of conspiracy by doing nothing more than agreeing to participate in the conspiracy so long as another co-conspirator does some overt act in furtherance of the conspiracy. *Walker v. State*, 828 S.W.2d 485, 487 (Tex.App.—Dallas 1992, pet. ref'd). However, if the evidence shows there was no actual, positive agreement to commit a crime, the evidence is insufficient to support a conviction for conspiracy. *Brown v. State*, 576 S.W.2d 36, 43 (Tex.Crim.App. [Panel Op.] 1978). Commission of the underlying substantive offense is not an essential element of conspiracy. *McCann v. State*, 606 S.W.2d 897, 898 (Tex.Crim.App. [Panel Op.] 1980). Since direct evidence of intent is rarely available, the existence of a conspiracy can be proven through circumstantial evidence. *Rhoten v. State*, 299 S.W.3d 349, 351 (Tex.App.—Texarkana 2009, no pet.).

Nothing in section 19.03(a)(2) of the Penal Code requires that the intended victim of the aggravating offense must also be the murder victim. *See Chirinos v. State*, 2011 Tex.App. LEXIS 147, at *14 n.3 (Tex.App.—Houston [14th Dist.] 2011, pet. ref'd). Appellant does not cite this Court to any authority holding otherwise and we see no reason to read such a requirement into the statute.

Jimenez provided information to Constable Prado, a government official, on the possible whereabouts of Appellant. Thus, he falls within the definition of an informant

12

for purposes of the retaliation statute. Jimenez testified that he felt threatened when four individuals made gestures to him when he left work the same day he gave that information to Prado. McCook, who lived in an upstairs apartment at the Beverly Arms, testified that Thomas told her Appellant and Hamilton blamed Jimenez for Wright's arrest and were plotting against him. Lakeisha Davis testified she had told the police that Appellant, Hamilton, Thomas and others were going to "get" the maintenance man [Jimenez]. Although she wavered in her testimony before the jury on whether Hamilton was present during the conversation, she did testify that the group talked about shooting the maintenance man.

Byronishia Moore, Appellant's girlfriend and a tenant at the Beverly Arms, testified she and Appellant went to a motel room with a group a few days after Wright was arrested. While there, they engaged in a conversation about getting the maintenance man. She denied any conversation about killing Jimenez and just thought the group was conspiring to beat him up. We conclude the evidence shows that Appellant conspired with others to harm or threaten to harm Jimenez in retaliation for providing information to Constable Prado that lead to Wright's arrest.

Appellant is guilty of Lujan's murder regardless of which conspirator actually fired the fatal shots. Thus, the evidence is legally sufficient to support the jury's verdict that Appellant, as a principal or party, murdered Jamie Lujan while in the course of attempting to commit the offense of retaliation against Mark Jimenez as alleged in the indictment. Issue two is overruled.

## ISSUE THREE – ADMISSION OF ANIMATION

By his third issue, Appellant alleges error by the trial court in admitting State's Exhibit 35A,[7] a computer generated three-dimensional ("3-D") time elapse animation that purportedly reconstructs events surrounding the shooting, as viewed from Evans's perspective. The animation is approximately 120 seconds in length and purportedly portrays her view from the bedroom window of her apartment and then from her front door. In the animation, three non-descript, identical, 3-D figures are seen standing in the breezeway adjacent to a non-descript single level box-like object, purportedly representing the office at the Emerald Green Apartments. The figures pause for approximately five seconds at the corner of that object and then disappear around a corner to the left. Approximately ten seconds later, seven loud gun shots are heard, all of the same decibel, but with various time lapses in between each shot. Two seconds after the last shot, the three figures are seen running through the breezeway in the opposite direction until they disappear to the right. The perspective then changes, purportedly moving from Evans's bedroom window to the front door of her apartment. Thirty-two seconds later, the animation portrays a single figure running from left to right across the screen.

Leading up to the admission of the animation, Yolanda Evans testified she knew Appellant and Hamilton through their families. Just before the shooting, she was looking out her apartment bedroom window and saw Appellant, Hamilton and Thomas standing in the alley near the Emerald Green Apartment office covering their faces with

---

[7]Exhibit 35 is the animation with audio. Exhibit 35A is the animation sans audio. Unless otherwise specifically noted, for purposes of this opinion we will refer to the exhibit simply as "the animation."

bandanas. When she inquired into their activity, they told her to stop being nosy. She ignored their warning and watched them go around the corner toward the office, which was out of her eyesight. She testified she heard "maybe five" shots and then saw the three individuals running. She witnessed Thomas and Appellant passing something back and forth. She momentarily lost sight of them in a blind spot then heard footsteps going upstairs. She moved from her window to her front door where she witnessed Thomas almost at the top of the stairs. Within seconds, she saw Thomas running down the stairs with a black bag in his hands and "looking scared."

After Evans testified before the jury, in a hearing outside the jury's presence, she was questioned by the State for the purpose of authenticating the animation. While Evans did state that the animation "accurately" depicted the view from her apartment window and then from her front door on August 28, 2008, cross-examination seemed to establish otherwise. Some of the questions related to the lack of a window screen in the animation and the fact that her building sits at a higher elevation than portrayed in the animation. Even though the gunshots in the animation were all the same decibel, other evidence established that the victim sustained wounds from two different caliber weapons, a .22 and .40 caliber. Cross-examination further revealed that while the suspects were of different body weights and heights, the suspects in the animation were identical. Additionally, although the number of gunshots heard in the animation was seven, Evans testified she heard "maybe five."

Numerous objections were lodged to the admission of the animation including relevance, probative value versus unfair prejudice, confusion of the issues, and the

inaccurate reflection of Evans's testimory. All objections were overruled and Evans was excused but was asked to leave a contact number.

Although the animation was identified by Evans in her testimony outside the presence of the jury, the State sought to introduce the exhibit before the jury through the testimony of the person who created the animation, Officer Joe Fielder, an accident reconstructionist. Fielder testified that he used crime scene measurements, photographs, Evans's statements and an accident reconstruction computer software program to create the animation.

The State then asked to publish the exhibit, whereupon defense counsel requested assurance that the record reflected their prior objections. At that point, the judge asked counsel to approach and inquired as to Evans's whereabouts. He expressed the following concern:

> I just would expect that she should be here to testify to the jury that that's the way it happened. I mean, that's just simple enough, you know. He places it. She looks at it. She says that's the way it happened. I mean, to me, that's what you need.

The State responded that Officer Fielder was sufficient to sponsor the exhibit before the jury and that Evans had already established its admissibility. In ruling the animation admissible, the judge added, "[s]o, okay, I guess so. But I just – That's not exactly the way I thought it was going to unwind." Defense counsel then made hearsay and confrontation clause objections which were overruled. The exhibit was admitted and played for the jury. In ruling the animation admissible, the trial court likened it to admission of a photograph, a visual aid for the jury. Notwithstanding its ruling, the trial

court again expressed concern in Evans not being available during Officer Fielder's testimony to authenticate the animation.

The defense asked to have Officer Fielder qualified as an expert before testifying about the animation. That objection was also overruled. During cross-examination, Officer Fielder admitted to discrepancies in the details of the animation but explained that some details were omitted because they require more memory to run the computer program. He testified that the number of shots heard in the animation was based on the number of shell casings found at the scene. Following Officer Fielder's cross-examination, the trial court announced, "[b]ased on your cross, I'm going to sustain the objection to the audio." Counsel for Appellant commented the ruling was "a little late." Thereafter, the court instructed the jury to disregard the audio portion of the computer generated animation, i.e., the seven gunshots. During redirect testimony, the court excused the jury and asked the parties if they had previously agreed to the animation during pretrial discovery. Defense counsel advised the court that they had only been made aware of it a few days prior to trial. The court reiterated that the animation was admissible, but that the State had not proven the audio portion to be fair and accurate.

Appellant contends admission of the animation violated Rules 602 and 701 of the Texas Rules of Evidence because Fielder lacked sufficient personal knowledge of the details it purports to reflect, such as placement of the individuals, elapsed time between distinguishable events, number and volume of gunshots, and the direction and speed of travel of the individuals portrayed. Appellant contends that because Fielder lacked sufficient personal knowledge of those details, as a layman he could only render an opinion or inference rationally based on the perception of a witness with personal

17

knowledge of those details, to-wit: Evans. He further argues that, even as an expert, his opinions and inferences are limited to the facts or data upon which an expert in his field of expertise would reasonably rely and that the perceptions of Evans lacked sufficient detail for him to speculate as to certain details, rendering the animation inadmissible. While we ultimately agree the trial court erred in admitting the animation, we conclude the error was harmless.

"A computer animation is merely a series of images generated by a computer that serves as demonstrative evidence. It may, for example, illustrate what a witness saw, demonstrate for the jury the general principles that underlie an expert opinion, or depict an expert's theory of how an accident occurred. In each such instance, the evidence may be authenticated by the witness's testimony that the computer animation presents a fair and accurate depiction . . . [of] what they purport to represent. If they do not, they will not be admissible." *Steven Goode, The Admissibility of Electronic Evidence*, 29 Rev. Litig. 1, 10 (Fall 2009).

The use of animations to depict a crime scene has been approved by Texas courts. The State cites *Mendoza v. State,* No. 13-09-00024-CR, 2011 Tex. App. LEXIS 4378 (Tex.App.—Corpus Christi 2011, no pet.) and *Murphy v. State*, No. 11-10-0150-CR, 2011 Tex.App. LEXIS 7230 (Tex.App.—Eastland 2011, no pet), as authority for the admissibility of such animations. In *Mendoza,* a computer generated three-dimensional diagram of the crime scene was produced using a commercially available software program. From that opinion it appears as if the animation depicted nothing more than a three-dimensional rendering of the crime scene showing possible bullet trajectories. In affirming the ruling of the trial court in admitting that evidence, the Corpus Christi Court

of Appeals noted that *diagrams* are generally admissible to explain the testimony of a witness and render it more intelligible.  2011 Tex. App. LEXIS 4378, at *41.  Nothing in the *Mendoza* opinion approves the use of speculative animations showing anything more than documented facts.

Similarly, in *Murphy v. State*, No. 11-10-0150-CR, 2011 Tex. App. LEXIS 7230 (Tex.App.—Eastland 2011, no pet.), the Eastland Court of Appeals approved the use of a computer generated animation of a crime scene. In *Murphy,* the supporting witness testified that he was a police officer assigned to the traffic division of the Midland Police Department, and that his duties included accident investigations and preparing accident reconstructions.  He indicated that the purpose of the animation in question was simply to show the amount of distance covered by two vehicles in a given period of time in order to show the relative positions of the vehicles in the roadway.  Unlike the animation in this case, he also testified that all the information and assumptions he used to generate the animation were based on speed and distance information actually known to him or other investigating officers.  After reviewing the animation, the court found that the factual discrepancies depicted did not cause the probative value of the evidence to be substantially outweighed by any unfair prejudice from its admission.

The animations in both *Mendoza* and *Murphy* depicted inanimate objects based on quantifiable measurements.  In this case, however, the animation attempts to portray the actions of at least four persons.  With respect to animations involving animate objects, the Texas Court of Criminal Appeals has said, "[a]ny staged, re-enacted criminal acts or defensive issues involving human beings are impossible to duplicate in every minute detail and are therefore inherently dangerous, offer little in substance and

19

the impact of re-enactments is too highly prejudicial to insure the State or the defendant a fair trial." *Miller v. State*, 741 S.W.2d 382, 388 (Tex.Crim.App. 1987). (quoting *Lopez v. State,* 651 S.W.2d 413, 414 (Tex.App.—Fort Worth 1983), *opinion withdrawn by Lopez v. State,* 667 S.W.2d 624 (Tex.App.—Fort Worth 1984), *which opinion was reversed on other grounds, Lopez v. State*, 664 S.W.2d 85 (Tex.Crim.App. 1985). "[T]he artificial recreation of an event may unduly accentuate certain phases of the happening, and because of the forceful impression made on the minds of the jurors by this kind of evidence, it should be received with caution." *Lopez,* 651 S.W.2d at 414 (quoting *People v. Dabb*, 32 Cal.2d 491, 498, 197 P.2d 1, 5 (1948)). This is especially true where the event sought to be depicted is simple, the testimony adequate, and the animation adds nothing more than a one-sided, manipulated visual image to the mental picture already produced in the mind of the jurors by the oral testimony of an eye-witness who has been subjected to the crucible of cross-examination.

We review a trial court's ruling on the admissibility of this exhibit under an abuse of discretion standard. *Coble v. State*, 330 S.W.3d 253, 272 (Tex.Crim.App. 2010). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000).

Rule 602 provides that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. TEX. R. EVID. 602. Rule 701 provides that if a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. TEX. R.

EVID. 701. The perception requirement of Rule 701 is consistent with the personal knowledge requirement of Rule 602. *See Furrow v. State*, 943 S.W.2d 895, 898 (Tex.Crim.App. 1997). *See also* Madrigal v. State, 347 S.W.3d 809, 814 (Tex.App.— Corpus Christi 2011, pet. ref'd). It requires the proponent of the lay opinion testimony to establish that the witness has personal knowledge of the events upon which his opinion is based. *Furrow,* 943 S.W.2d at 898. If the proponent of the evidence cannot establish personal knowledge, the trial court should exclude the testimony. *Id.*

Before State's Exhibit 35 was admitted, the defense asked to have Fielder qualified as an expert. That objection was overruled and he testified as a lay person. He testified that by using crime scene measurements, photographs, Evans's statements and an accident reconstruction computer software program, he was able to create the animation. Nothing in the record, however, supports many of the details contained in the animation. Those details were provided by nothing more than pure speculation on his part. Accordingly, we conclude the trial court abused its discretion in admitting the computer generated animation.

Finding error in the admission of the animation does not, however, end our inquiry. The admission of evidence in violation of an evidentiary rule is non-constitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). We must disregard the error if it did not affect Appellant's substantial rights. Tex. R. App. P. 44.2(b). We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.Crim.App. 2011); *Motilla v. State*, 78 S.W.3d 355-56 (Tex.Crim.App. 2002). Reversal is required for non-constitutional error if the reviewing court has grave doubt that the result of the

21

trial was free from the substantial effect of the error. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex.Crim.App. 2002). "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error. Thus, in cases of grave doubt as to harmlessness the petitioner must win." *Id.* at 637-38 (citing *O'Neal v. McAninch*, 513 U.S. 432 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

The crux of the case against Appellant was linking him to the conspiracy to get Jimenez. Davis and Moore testified that Appellant entered into an agreement with others to retaliate against Jimenez for giving Constable Prado information which led to the arrest of his friend. The animation did little to answer that question. Moreover, the improper admission of evidence is harmless if the trial record contains other, properly admitted evidence that is probative of the same manner. *See Saldano v. State,* 232 S.W.3d 77, 102 (Tex.Crim.App. 2007). Considering the entirety of the record, including the contested issues, we conclude that Appellant's substantial rights were not affected by admission of the animation and that the error in admitting it was harmless. *See generally Miller v. State*, 741 S.W.2d 382, 388 (Tex.Crim.App. 1987). Issue three is overruled.

### SUPPLEMENTAL ISSUE – CONSTITUTIONALITY OF SENTENCE

In 2008, when the offense occurred, section 12.31 of the Texas Penal Code provided that "[a]n individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the institutional division for life *without parole.*" *See* Act of May 28, 2005, 79th Leg., R.S.,

ch. 287, § 1, 2005 Tex. Gen. Laws 2705 (emphasis in original Act). Effective September 1, 2009, (subsequent to the date the offense occurred, but prior to trial) the Legislature amended section 12.31(a) of the Texas Penal Code to provide that "[a]n individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for: (1) life, if the individual's case was transferred to the court under Section 54.02, Texas Family Code, or (2) life without parole." In conjunction with that amendment, the Legislature also amended section 12.31(b) to provide that in a capital case in which the state does not seek the death penalty, prospective jurors shall be informed that "a sentence of life imprisonment is mandatory on conviction of the capital felony, if the case was transferred to the court under Section 54.02, Family Code. . . ." *See* TEX. PENAL CODE ANN. § 12.31(a) & (b) (WEST 2011).

In his Supplemental Brief, Appellant contends that because he was sixteen years old when his crime was committed, and because his case was transferred to the trial court under section 54.02 of the Texas Family Code, assessment of the sentence of life *without parole* violates the *Eighth Amendment* to the United States Constitution. In support of his claim, Appellant cites *Miller v. Alabama,* 567 U.S*. ___,* 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012)*,*[8] *decided June 25, 2012*, in which the United States Supreme Court held that, as to a criminal defendant who was under the age of eighteen at the time when he committed a capital crime, the mandatory imposition of life without the possibility of parole violates the *Eighth Amendment's* prohibition of "cruel and unusual punishments."

---

[8]The *Miller* opinion actually addresses two separate cases, No. 10-9646, *Miller v. Alabama* and No. 10-9647, *Jackson v. Hobbs.*

Miller, a fourteen year old at the time of his offense, was charged with murder in the course of arson, a capital offense under Alabama law. His case was removed to adult court and, following conviction, the trial court imposed the statutorily mandated punishment of life without parole in accordance with Alabama law. 132 S.Ct. at 2463. Jackson, also fourteen years old at the time of his offense, was charged with capital felony murder and aggravated robbery in connection with the robbery of a video store. An Arkansas jury convicted him of both crimes and the trial court imposed a mandatory sentence of life imprisonment without the possibility of parole in accordance with Arkansas law. *Id.* at 2461. In both cases, the Supreme Court held that a sentencing scheme requiring the mandatory imposition of a life sentence *without parole*, in a homicide case where the criminal defendant was under the age of eighteen at the time the crime was committed, violated the *Eighth Amendment's* prohibition of cruel and unusual punishment. *Id.* at 2460.

Here, there is evidence in the record that Appellant was sixteen years old when he committed the instant offense, and the State does not contend otherwise. The offense was committed on or about August 28, 2008, and the Clerk's Record contains a *Waiver of Jurisdiction and Order of Transfer to Criminal District Court* wherein it is stated that the Appellant's date of birth is August 29, 1991. In view of the State's implied concessions and the documentation reflecting Appellant's birthdate, the record adequately reflects that Appellant was younger than eighteen years of age at the time of the offense and his case was transferred to the trial court pursuant to section 54.02 of the Texas Family Code. Accordingly, Appellant's supplemental issue is sustained.

**CONCLUSION**

Pursuant to the Supreme Court's mandate in *Miller*, Appellant's sentence of *life without parole* is hereby reformed to a sentence of *life* imprisonment.  TEX. R. APP. P. 43.2.  *See Salinas v. State*, 163 S.W.3d 734 (Tex.Crim.App. 2005); *Herrin v. State*, 125 S.W.3d 436, 444 (Tex.Crim.App. 2002); *Collier v. State*, 999 S.W.2d 779, 782 (Tex.Crim.App. 1999).  As reformed, the trial court's judgment is affirmed.


Patrick A. Pirtle
Justice


Publish.