**Opinion issued July 28, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00569-CR

———————————

**VICTOR MANUEL ALAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1467825**

---

## MEMORANDUM OPINION

Victor Alas, a minor, was convicted of capital murder and sentenced to life in prison without the possibility of parole for his role in the death of a teenage girl. In four issues, he contends that the trial court erred by (1) impermissibly denying him the possibility of parole, (2) denying his Rule 403 evidentiary motion, (3) denying

his motion for mistrial, and (4) refusing to include in the court's charge a requested "voluntariness" instruction, in addition to the voluntariness instructions already included.

We affirm the conviction, but we reform the judgment to delete the phrase "without parole." As reformed, the trial court's judgment is affirmed.[1]

## Background

Alas, a couple of his male friends, and Cathy Cuellar[2]—all teenagers—became acquainted with a middle-aged woman who lived in a nearby apartment. That woman began to allow the teenagers to use her apartment to drink and smoke marijuana. One night,[3] the teenagers took Xanax before meeting at the apartment. Although Cuellar, age 15, had experience with alcohol and marijuana, this was the first time she had used Xanax. After a couple of hours in the apartment, Cuellar became very intoxicated. She was slurring her words and stumbling, and she needed assistance to walk. The apartment owner agreed that Cuellar could spend the night.

---

[1]     TEX. R. APP. P. 43.2 (permitting intermediate appellate courts to modify trial court's judgment and affirm it as modified).

[2]     The complainant is referred to by a pseudonym.

[3]     These events occurred after 10:00 p.m. on a school night. While the others were scheduled to return to school the next day, Alas had a court date on a burglary charge and had told his friends that he thought he would be confined to jail following his court appearance.

When Cuellar went to the bedroom, Alas, age 16, went with her. According to Alas, they began a consensual physical encounter in the bedroom. They were interrupted when their friend, Jose Reyes, age 17, knocked on the bedroom door. The owner did not like that the boys were in her bedroom and told them to leave the apartment. Instead of spending the night at the apartment as planned, Cuellar left with Alas and Reyes.

The three went to a vacant apartment approximately one block away that the teenagers frequently visited to take drugs. There, all three went into an empty closet and, according to Alas, had consensual sex.[4]

However the encounter began, it quickly turned into a brutal, physical attack on Cuellar. She was struck in the head 15 times with an ashtray and a toilet tank lid, causing the shape of her head and facial features to be distorted. She was stabbed over 60 times with a screwdriver. Her eyes were gouged, and a metal hook was lodged in her eye socket. She was beaten with plastic rods from the apartment's vertical blinds. Then she was impaled, anally, with two of those rods, which severely damaged her intestines and liver. Finally, an inverted cross was carved into her abdomen, with a t-shirt covering a portion of that injury and a bra attached over the t-shirt. There was evidence that most of these injuries, including the impalement,

---

[4]     Photographs of the sexual encounter were downloaded from Reyes's phone and admitted into evidence.

occurred while Cuellar was still alive, though some, such as the "cross" carving, were after she had died. Cuellar's body was discovered a few days later.

The police quickly received a lead that Reyes and Alas were involved. Reyes was arrested first. Then, Alas was arrested, mid-day, at the alternative school he attended. He was taken to a magistrate for warnings. Afterwards, he was taken to be interviewed in the Homicide Division, where he gave a statement.

Alas told the police that he participated in consensual sex with Cuellar and Reyes in the empty apartment closet but denied that he played any role in the attack other than briefly choking Cuellar with a belt. He said he put the belt around her neck but eventually removed it, leaving her gasping for air. He told the police that he did not cause any of her physical injuries and was not physically involved in causing her death. He blamed Reyes for her injuries and death.

According to Alas, when Reyes began attacking Cuellar, he became scared and went to the kitchen area of the apartment. Although Alas denied any involvement in Cuellar's severe injuries, he gave the police specific details about her injuries that they had not yet discovered. For example, Alas revealed in his statement that Cuellar had been choked with a belt and that the objects that were used to impale her were plastic rods from the vertical blinds in the apartment. At the time, the police knew neither.

During the interview, Alas told the officers that he discarded the screwdriver in some bushes at a nearby church. Two police officers immediately drove to the church and located the screwdriver where he had indicated.

At the capital murder trial, a forensic DNA analyst with the Houston Forensic Science Center testified that Alas could not be excluded as a source of the DNA found on the screwdriver and inside Cuellar. A medical examiner testified about Cuellar's injuries and cause of death. She described multiple, severe injuries and informed the jury that most of those injuries occurred before Cuellar's death, including the gouging of her eyes and the impalement. She testified that Cuellar eventually died from "multiple blunt and sharp force injuries." Homicide Detective M. Condon testified that "it appeared . . . that it had to be more than one person" involved in Cuellar's death, given the condition of her body and the "very violent" nature of her death. In his opinion, "it took more than one person to commit this murder."

Alas testified as well. He admitted using alcohol, marijuana, and Xanax that night. He said that the sexual encounter was consensual. According to Alas, Reyes had been taking pictures when he became distracted by other items on his phone. Reyes began asking Alas some questions, and then, unexpectedly, struck Cuellar in the head with an ashtray. Alas testified that he became shocked and scared. He told

Reyes he was going to leave, but Reyes made a statement that he interpreted as a threat. Instead of leaving, he went into the separate kitchen area of the apartment.

Alas testified that, from his hiding place in the kitchen, he heard some muted noises followed by a loud "glass breaking" sound. At that point, he returned to the living room, where Reyes was hitting Cuellar in the head with a toilet tank lid. He then saw the blood and the protruding rods. He yelled for Reyes to leave her alone and for them to leave. Reyes handed him a screwdriver, ashtray, and belt; Alas discarded the three items as they were leaving the apartment. Alas testified that he did not know whether Cuellar was still alive when he and Reyes left the apartment.

Alas testified that he did not participate in any of Cuellar's injuries and denied that he retaliated against her so she would not report the initial assault to the police. He also recanted his earlier statement to police that he choked her with a belt. He claimed he said something to the police that was untrue because he was scared and thought that was what they wanted to hear.

The jury convicted Alas of capital murder. The trial court announced the automatic sentence of life imprisonment. *See* TEX. PENAL CODE ANN. § 12.31(a)(1); *Lewis v. State*, 428 S.W.3d 860, 863 (Tex. Crim. App. 2014). The written judgment of conviction gave a different sentence: life without parole. Alas appealed.

**Availability of Parole for a Juvenile Convicted of Capital Murder**

In his first issue, Alas argues that his sentence of life imprisonment without the possibility of parole violates Texas law. He argues that, because he was a juvenile at the time of the offense, Section 12.31(a)(1) of the Texas Penal Code requires that his life sentence include the possibility of parole. We agree.

Section 12.31 specifies the punishment for an individual convicted of capital murder when the State is not seeking the death penalty. *See* TEX. PENAL CODE ANN. § 12.31(a). The mandatory punishment is "life without parole, if the individual committed the offense when 18 years of age or older." *Id.* § 12.31(a)(2). It is "life, if the individual committed the offense when younger than 18 years of age." *Id.* § 12.31(a)(1); *Lewis*, 428 S.W.3d at 863 ("Life imprisonment, with the possibility of parole, is the mandatory sentence for defendants convicted of capital murder for crimes they committed as juveniles.").

Alas was 16 years of age at the time of the offense.[5] After the jury found him guilty of capital murder, the trial court immediately pronounced punishment as "confinement in the Texas Department of Criminal Justice Institutional Division for life," consistent with Section 12.31(a)(1). But, contrary to the requirements of

---

[5]  Alas's case was not resolved in the juvenile court system because that court waived jurisdiction and ordered transfer to the criminal district court. *See* TEX. FAM. CODE ANN. § 54.02 (waiver of jurisdiction and discretionary transfer to criminal court).

Section 12.31(a)(1), the trial court's written judgment reflects that Alas was sentenced to life imprisonment without the possibility of parole.

In its brief, the State "concurs that the judgment should be reformed to correct the clerical error and reflect that appellant is subject to review for parole." *See* TEX. R. APP. P. 43.2 (permitting court of appeals to modify trial court's judgment and affirm it as modified); *Lewis v. State*, 402 S.W.3d 852, 867 (Tex. App.—Amarillo 2013) (reforming judgment on capital murder conviction of juvenile from "life without parole" to "life"), *aff'd*, 428 S.W.3d 860 (Tex. Crim. App. 2014) (focusing on related issue of whether sentence of minor to life imprisonment without individualized sentencing hearing is cruel and unusual punishment).

Because the written judgment imposes a sentence on Alas that goes beyond what is allowed by statute, as the State concedes, we sustain Alas's first issue.

## Article 38.23 "Voluntariness" Instruction

In his third issue, Alas argues that the trial court erred by refusing to include in its charge an Article 38.23 jury instruction. When included in a court's charge, an Article 38.23 jury instruction requires the jury to resolve a disputed issue of material fact that is essential to the determination of whether evidence was obtained illegally from the defendant. TEX. CODE CRIM. PROC. ANN. art. 38.23. If the jury determines the issue in the defendant's favor, it is instructed to disregard the challenged evidence, which, here, would be Alas's statements to the police. *See id.*

8

Drawing a distinction between two available methods of challenging the State's reliance on his police-interview statement, we note that Alas is not challenging the admissibility of his statement to police; instead, he is challenging the refusal of a jury-charge instruction that would have told the jury to disregard his statement if it resolved a disputed, material factual issue in his favor.

## A. Applicable law

In analyzing a jury-charge issue, we first determine whether error exists. *See Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984); *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Only if we find error, do we consider harm. *See Tottenham*, 285 S.W.3d at 30. To determine whether error occurred in the denial of Alas's request for an Article 38.23 instruction, given that an Article 38.22 instruction was included, we consider the various jury instructions on "voluntariness," the proper circumstances for each instruction, and the requirements for a request under Article 38.23.

Article 38.21 of the Texas Code of Criminal Procedure provides that a defendant's statement may be used against him "if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21; *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). To decide whether a statement was voluntary, we consider the totality of the circumstances that surround its making. *Delao*, 235 S.W.3d at 239.

Under Texas statutory law, there are three types of jury instructions that relate to the voluntariness of a defendant's statement: (1) a "general" voluntariness instruction from Section 6 of Article 38.22; (2) a "general" warnings instruction from Section 7 of Article 38.22; and (3) a "specific" exclusionary-rule instruction from Article 38.23. *Oursbourn v. State*, 259 S.W.3d 159, 173 (Tex. Crim. App. 2008). When the evidence raises a voluntariness issue, "the defendant should request a jury instruction that relates to his theory of involuntariness." *Id.* at 174.

The Article 38.22 Section 6 "general" voluntariness instruction states that "unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 174.[6]

The Article 38.22 Section 7 "general" instruction focuses on whether the defendant who made a custodial statement was adequately warned of his rights and knowingly and intelligently waived them so that his statement is voluntary. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 7; *see id.* § 2. Under Section 7, if a defendant

---

[6] The sequence of events that "seems to be contemplated by Section 6," according to the Court of Criminal Appeals, begins with the issue being raised whether the defendant voluntarily made the statement, the judge holding a hearing and deciding that the statement was voluntary, the defendant offering evidence to suggest that it was not voluntary, and the trial court then instructing the jury, generally, on voluntariness. *Oursbourn v. State*, 259 S.W.3d 159, 175 (Tex. Crim. App. 2008).

makes a statement as a result of a custodial interrogation and the evidence raises an issue regarding the adequacy of the warnings he received, the defendant is entitled to have the jury decide whether he was adequately warned and whether he knowingly and intelligently waived them. *Oursbourn*, 259 S.W.3d at 176.

When incorporated into a jury charge, an Article 38.22 instruction can protect a criminal defendant both from police overreaching that leads to an involuntary statement and from any effects on the defendant's mental state that might cause his statement to be involuntary, such as being ill and on medication, lacking mental capacity to understand his rights, or being too intoxicated to understand that he is signing a confession. *See id.* at 172–73 (stating that Article 38.22 general voluntariness instruction protects "people from themselves because the focus is upon whether the defendant voluntarily made the statement. Period."). Alas received two Article 38.22 general instructions. He did not, however, receive the Article 38.23 instruction he requested.

The "specific" Article 38.23 instruction has a different focus from the "general" Article 38.22 instructions. It is a fact-based instruction that is narrowly focused on the specific tactic used to obtain a statement and whether that tactic was illegal, thereby destroying the statement's voluntariness. *Id.* at 178; *Mbugua v. State*, 312 S.W.3d 657, 668–69 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Article 38.23 provides as follows:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. If any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, *that the evidence was obtained in violation* of the provisions of this Article, then and in such event, the jury shall disregard any such evidence *so obtained*.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (emphasis added). Article 38.23 is commonly referred to as a "specific exclusionary rule." *See, e.g.*, *Oursbourn*, 259 S.W.3d at 178 ("Normally, 'specific' exclusionary-rule instructions concerning the making of a confession are warranted only where an officer uses inherently coercive practices" to "wring a confession out of a suspect against his will" and "there is a disputed fact issue" about the coercion).

To be entitled to an Article 38.23 jury instruction, the defendant must establish that (1) the evidence heard by the jury raises an issue of fact, (2) the evidence on that fact is affirmatively contested (not merely the subject of cross-examination), and (3) the contested factual issue is "material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary." *Id.* at 177; *see Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012); *Madden v. State*, 242 S.W.3d 504, 510–12 (Tex. Crim. App. 2007) ("The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct.")

12

The Court of Criminal Appeals has provided an example of what an Article 38.23 "fact-specific, exclusionary-rule instruction might look like":

> If you find from the evidence that Officer Obie held a gun to the defendant's head in an effort to make the defendant give him a statement, or if you have a reasonable doubt thereof, you will disregard the defendant's videotaped statement and not use it for any purpose whatsoever during your deliberations. However, if you find from the evidence, beyond a reasonable doubt, that Officer Obie did not hold a gun to the defendant's head in an effort to make the defendant give him a statement, then you may consider the defendant's videotaped statement during your deliberations.

*Oursbourn*, 259 S.W.3d at 177 n.69.

Thus, when an Article 38.23 instruction is given, the jury is tasked with resolving "specific historical," disputed facts. *Mbugua*, 312 S.W.3d at 669. If there is not a material factual dispute about the police's conduct, then the legality of that conduct is determined by the trial judge as a question of law and an Article 38.23 instruction would be inappropriate. *Oursbourn*, 259 S.W.3d at 177–78; *Madden*, 242 S.W.3d at 510–11.

## B.     Trial court did not err by refusing the Article 38.23 instruction

Alas requested that the trial court include in its charge an instruction on voluntariness under Article 38.23. The instruction Alas requested is as follows:

> [I]f you believe or have a reasonable doubt thereof that the defendant's statement to HPD detectives was not voluntarily obtained in violation of the provisions of the constitution or laws of the State of Texas, or the Constitution[ ] [or] laws of the United States of America, then in such event, you will wholly disregard such evidence and not consider it as any evidence whatsoever.

When he requested the instruction, Alas did not identify a factual dispute the jury would need to resolve to determine if the officers violated a constitutional provision or other law. His request was denied.

Even without that instruction, the jury charge did include an Article 38.22 Section 6 general instruction on voluntariness. It advised that an "oral statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." The charge also included an Article 38.22 Section 7 general instruction regarding whether Alas was properly warned and whether he "knowingly, intelligently and voluntarily waived the rights" set out in those warnings.

Alas now asserts that the material factual dispute that required an additional Article 38.23 specific voluntariness instruction was whether he was "scared" while giving his police statement. According to Alas, one of the officers leaned toward him only a few inches away from his face, and he felt pressured during the almost hour-long interview. He argues that the issue of whether he was scared was disputed because he testified he was scared but one of the officers who was in the interview room at the time testified that Alas did not appear scared while giving his statement. Alas further argues that being "scared" is relevant to the voluntariness of his statement because of his youthfulness, his low level of literacy, and the tactics used by the police during the interview and statement.

The State responds that Alas failed to identify a material fact in dispute when he requested the instruction. The State also asserts that Alas's argument is better viewed as raising a general voluntariness issue, which was addressed through the Article 38.22 instructions the court included in its charge. In other words, the voluntariness issue Alas is raising fits within Article 38.22 and, because the trial court gave Article 38.22 instructions to the jury, there is no error or harm.

We agree that Alas's requested jury instruction failed to identify a specific disputed historical fact that was material to whether the police's conduct in obtaining his statement was legal. Accordingly, we conclude that the trial court did not err by denying his requested instruction. Because we have concluded that the trial court did not err, we do not reach the issue of harm.

We overrule Alas's third issue.

## Rule 403 Challenge to Crime-Scene Photographs

In his second issue, Alas argues that the trial court erred by denying his Rule 403 objection to five crime-scene photographs. The five photographs he challenges are Exhibits 18, 19, 23, 24, and 41.

When Alas objected to these photographs, he argued that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, particularly given "the nature of this case with a confession." The State responded to Alas's objection with two points: first, each photograph "shows something

separate and apart from the other" photographs, meaning that the photographs were taken at different angles and revealed different, relevant information; and, second, Exhibits 19, 24, and 41 would only be shown to the jury as a "glossy" and not on "the big screen," given the gruesomeness of the images. The trial court overruled Alas's objection and admitted all five photographs into evidence.

## A. Standard of review

We review a trial court's ruling on a Rule 403 objection for an abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). Thus, we give "substantial discretion" to a trial court to weigh the probative value of the challenged evidence against the danger of unfair prejudice. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005); *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

## B. Rules 401, 402, and 403

"[T]he rules of evidence are inclusionary rather than exclusionary with a presumption that relevant evidence is admissible . . . ." *Erazo v. State*, 144 S.W.3d 487, 499 (Tex. Crim. App. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." TEX. R. EVID. 401. "Relevant

16

evidence is admissible" unless provided otherwise by rule, statute, or other law. TEX. R. EVID. 402.

Although relevant, evidence may be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006) ("Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.").

Unfair prejudice does not mean simply having an adverse or detrimental effect on a defendant's case. *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). "Virtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it." *Id.* Instead, "unfair prejudice" refers to "an undue tendency to suggest a decision on an improper basis, commonly an emotional one." *Id.*

The factors a trial court considers in a Rule 403 analysis include: "(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of

17

the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

For photographic evidence, in particular, the balancing of probativeness against the danger of unfair prejudice should consider "the number of photographs, the size of the photograph, whether it is in color or black and white, the detail shown in the photograph, whether the photograph is gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment." *Shuffield*, 189 S.W.3d at 787.

## C. Trial court did not err by admitting the photographs

Alas challenges five photographs, all of which are in color and show the complainant's partially exposed body and her multiple injuries. Alas describes the photographs as "gruesome" and singles out three of them (Exhibits 19, 23, and 24) as "particularly gruesome."

Exhibit 18 is a color photograph of Cuellar's body lying on the floor with arms and legs extended. She is clothed only on her upper body. Her face is visibly bloodied, and there are pieces of the white porcelain tank lid broken around her. The photograph is taken from a distance; the resolution of the image appears low.

Exhibit 19 is a color photograph taken from the opposite vantage point. In this photograph, it can be discerned that Cuellar's bra is fastened over her shirt. Also visible in this photograph are the two rods protruding from her body between her legs.

Exhibit 23 is a color photograph taken from the same angle as Exhibit 19. In this photograph, individual pieces of evidence are marked with numbered yellow markers.

Exhibit 24 is a color photograph that provides a closer image of Cuellar's face. The facial structure is visibly damaged, particularly around the eyes, although the precise injuries are unclear due to the blood coverage.

Exhibit 41 is a color photograph taken from the right side of Cuellar's body. The image is centered on a large piece of porcelain that has a bloodied, sharp corner. Also visible from this angle are the lacerations on her torso in the shape of an inverted cross.

Officer A. Barr, a crime scene investigator, testified that the photographs accurately depicted the crime scene as he found it. There is no evidence that the body had been altered or moved before the photos were taken. Nor is there any allegation of tampering, enhancement, or an attempt by the State to inflame, confuse, or mislead the jury with its method of presentation. *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (indicating that lack of such assertion supported

conclusion that trial court did not err by admitting gruesome photographic evidence over Rule 403 objection). Further, all photographs were taken at different angles and provided relevant evidence regarding the crime, the physical evidence surrounding Cuellar's body, and her injuries. *See Shuffield*, 189 S.W.3d at 787 (stating that photographs were relevant and admissible because they "showed the location of the body at the crime scene and the wounds that caused the victim's death," and further, that relevance of photographs is not necessarily reduced when jury hears testimony regarding injuries depicted in photographs).

While the photographs could accurately be described as "gruesome," "they are no more gruesome than the crime scene itself as it was found by the police" or "than would be expected" given the severity of Cuellar's injuries. *Id.* at 787, 788; *Shavers v. State*, 881 S.W.2d 67, 77 (Tex. App.—Dallas 1994, no pet.) ("The fact that the scene depicted in the photograph is gory and gruesome does not make the photograph more prejudicial than probative when the crime scene is gory and gruesome.").

Further, the photographs were not "so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of [the] case after viewing them." *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992) (quoting *Fuller v. State*, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992)). The images were captured from a distance and did not offer a

20

detailed view of any single injury. *Cf. Reyes v. State*, No. 14-14-01002-CR, 2016 WL 1043341, at \*11–12 (Tex. App.—Houston [14th Dist.] Mar. 15, 2016, no pet. h.) (analyzing same crime-scene photographs in Jose Reyes's appeal of his capital murder conviction for Cuellar's death and concluding that trial court did not err by denying Reyes's Rule 403 objection).

Because these photographs were probative of the crime scene and injuries, the more detailed ones were not shown on the large display screen but, instead, published only in a small format, and the gruesomeness of the evidence was no more gruesome that the crime itself—or than the mental image formed when the oral description of Cuellar's extensive injuries was given—we conclude that the trial court did not abuse its discretion by concluding that the relevant evidence was more probative than prejudicial or by admitting these photographs into evidence. *See Sonnier*, 913 S.W.2d at 519 ("[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence.").

We overrule Alas's second issue.

## Mistrial

In his fourth and final issue, Alas argues that the trial court erred by denying his motion for a mistrial.

## A.    Statement that prompted the motion

Homicide Detective Condon testified about the three-month investigation that uncovered the evidence admitted at trial. His testimony included a discussion of online communications between Alas and Reyes, as well as online comments made by their teenage friends.

The police determined that this group of teenagers frequently communicated through Facebook. Condon explained that he would identify individual teenagers who might have knowledge relevant to the investigation and then attempt to gain access to the teenagers' Facebook pages and posts. As Detective Condon was describing this process, he informed the jury that Officer Vinto helped him obtain search warrants and review Facebook posts. He volunteered that Officer Vinto "works in the Gang Unit and they had classified this murder as a gang murder."

Alas immediately objected to the statement, and the objection was sustained. Alas asked that the jury be instructed to disregard the statement, and the court gave that instruction. Alas then moved for a mistrial, which was denied. The testimony immediately returned to the Facebook search warrants and the evidence obtained through that process.

## B.    Applicable law and standard of review

When a trial court instructs the jury to disregard an improper statement but denies a motion for mistrial based on the statement, we review the denial for an

abuse of discretion. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011); *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). We must uphold the trial court's ruling to deny the motion for mistrial if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

A mistrial is a remedy for "extreme circumstances" when the prejudice is "incurable." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Williams*, 417 S.W.3d at 175. "Generally, a mistrial is only required when the improper evidence is 'clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury.'" *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999) (quoting *White v. State*, 444 S.W.2d 921, 922 (Tex. Crim. App. 1969)); *Williams*, 417 S.W.3d at 175. "In most instances, an instruction to disregard the remarks will cure the error." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Indeed, "the jury is presumed to follow the trial court's motion to disregard improperly admitted evidence." *Hinojosa*, 4 S.W.3d at 253.

## C.     Trial court did not err by denying motion

The challenged portion of Detective Condon's testimony did not focus on the "gang" designation placed on the murder; instead, it focused on the role that the officer played in obtaining evidence of Facebook communications between these

23

teenagers, including deleted comments that had to be recovered forensically. When Detective Condon volunteered the "gang" remark, the trial court quickly instructed the jury to disregard it. Cordon did not make any additional statements indicating that the crime was gang related.[7] The State did not revisit the point.

Under these circumstances, we conclude that the court's instruction to disregard cured the prejudicial effect of the detective's statement, and the trial court did not abuse its discretion by denying the motion for mistrial.

## Conclusion

We reform the judgment to delete the phrase "without parole." As reformed, we affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Keyes, Brown, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[7]  To the contrary, Detective Condon testified that criminal suspects typically fall into three types: (1) hard-core criminals and "gang members" who will not talk to police, (2) those who will talk to police but will try to cover up their crimes, and (3) those who are eager to confess. He testified that Alas fell into the second category, meaning that he did not present like a "gang member."