Opinion by: Patricia O. Alvarez, Justice
Appellant Gerardo Venegas was charged with intoxication assault, failure to render aid, and aggravated assault causing serious bodily injury, alleged to have been committed on January 1, 2014, in Webb County, Texas. On May 20, 2016, after several days of trial, and after the case had been submitted to the jury, Venegas voluntarily absconded. The trial proceeded in his absence. The jury found Venegas not guilty of intoxication assault and guilty of failure to render aid and aggravated assault causing serious bodily injury. The jury also made an affirmative finding that Venegas used or exhibited a deadly weapon, specifically an automobile, during the commission of the offense or during the immediate flight therefrom.
On May 23, 2016, the matter was called for punishment. Venegas did not appear. The trial court made a second affirmative finding-that Venegas voluntarily absented himself-and the trial court proceeded to hear punishment evidence. After the close of testimony, and argument of counsel, the trial court sentenced Venegas, in absentia, to five-years' confinement in the Institutional Division of the Texas Department of Criminal Justice on the failure to render aid, and to twenty-years' confinement on the aggravated assault causing serious bodily injury. The trial court signed an interim judgment on June 8, 2016. Defense counsel's motion to withdraw was granted by the trial court.
On July 20, 2016, Venegas was arrested on the outstanding warrant. The following day, with Venegas present, but without an attorney, the trial court pronounced sentence consistent with the sentence announced on May 23, 2016, and the interim judgment signed June 8, 2016. A final judgment was signed on July 21, 2016.
*342 On appeal, Venegas raises four issues: (1) the computer-generated animation of the accident was unreliable because it was based on estimates and not actual measurements; (2) the trial court erred in denying Venegas's motions for continuance; (3) the evidence was legally insufficient to support the jury's verdict of aggravated assault based on Venegas's driving "too fast;" and (4) the trial court erred in pronouncing sentence, a critical stage of the trial, without providing Venegas assistance of counsel. We affirm the trial court's judgment.
FACTUAL AND PROCEDURAL BACKGROUND
A. Pretrial Motion for Continuance
On May 16, 2016, the day before testimony was scheduled to begin, defense counsel sought a thirty-day extension to allow his accident reconstruction expert to conduct his own independent calculations. Defense counsel's argument relied on the State's accident reconstruction report being provided to the defense two years and three months after the accident, but less than sixty-days prior to trial, and a supplemental report was completed on May 13, the week before trial. The State countered the supplemental report was simply a visual aid to assist the jury in understanding the mathematical calculations and that the State had provided defense counsel copies of the accident reconstruction video on December 8, 2014, February 5, 2015, and March 16, 2015. The trial court denied the motion for continuance.
B. Guilt-Innocence Phase
1. Evidence Presented before the Jury
On the morning of January 1, 2014, United States Border Patrol Agent Adan Berlanga, his wife, and Santiago Arando, were driving northbound on McPherson Street, Webb County, Texas, after picking up breakfast tacos.
a. Accident
Agent Berlanga testified that he noticed a black Hummer traveling southbound on McPherson, at a high rate of speed; he estimated the Hummer was traveling between eighty and one-hundred miles per hour, in a thirty-five mile per hour zone. Arando testified that he noticed the Hummer because "that truck was just going way too fast."
Agent Berlanga further described a silver Chevrolet Aveo stopped at the red light. The silver car had turned on her signal to "get back into the lane to go straight." Agent Berlanga testified that two or three seconds after the light turned green, the black Hummer slammed into the rear of the Aveo. "The impact was very loud.... The entire back half of the car from the headrest of the seat to the rear end of the vehicle was completely gone." He further testified that the Hummer did not stop after hitting the Aveo. After Agent Berlanga's wife and Arando "jumped out" to assist the driver of the Aveo, Agent Berlanga left the scene, in an attempt to help locate the Hummer for law enforcement. Arando testified that they tried to communicate with the "lady in the silver car," but "she just stared forward, her eyes were open, she was just staring." The victim, Rosalinda Ramos, was conscious, but could not respond to verbal commands.
b. Locating the Black Hummer and the Silver Pontiac Grand Prix
Based on information provided by Agent Berlanga and Air Interdiction Agent James Wyatt, Investigator Steven Moncivais and Laredo Police Officer James Boyd located the abandoned black Hummer, not far from the accident scene. It appeared as if the Hummer hit the curb and lost a tire;
*343 the Hummer was inoperable and empty. Both officers noted a significant amount of blood visible in the vehicle on the driver's side of the interior compartment.
Investigator Valerie Mora determined the Hummer was registered to a female; however, no one answered at the address provided. Dispatch notified officers that the Hummer was involved in a traffic stop, shortly before the accident. Although Gerardo Venegas was identified as the driver during the traffic stop, he was not at the address he provided at the traffic stop. Investigator Mora obtained an address purported to be that of both Venegas and the Hummer's registered owner; the officer was told there would be a white Mercedes located at the residence.
While the officers were locating the black Hummer, dispatch received information that following the accident, the driver of the black Hummer was picked up by a silver Pontiac Grand Prix. Air Interdiction Agent Wyatt assisted in locating the silver Pontiac and directing ground officers to its location. As officers arrived at the location, as directed by Agent Wyatt, Investigator Mora arrived at the same location looking for Venegas. A silver Pontiac Grand Prix and a white Mercedes were in the driveway. As the officers approached the front door, Investigator Mora noticed blood on the door handle. The officers rang the doorbell, and after several minutes, Venegas exited the house, and identified himself. His nose and mouth appeared to be swollen and red; and he appeared to have a busted lip. Venegas was detained, Mirandized , and escorted to the police station.
According to Officer Wesley Paredes, when Venegas arrived at booking, he was "very belligerent, was very rowdy, he was just acting up, cursing at the officers, being very disrespectful, combative." Venegas had a couple of cuts on his hands, fresh bloodstains on his clothes, a small cut on his mouth, his nose looked red and swollen, and his eyes were "glossy red." Officer Paredes further testified that Venegas had a strong odor of alcohol coming from his person, from his breath. He told the officer, "I'm drunk. Let's get this over with, whatever we are going to do. Let's go. Let's take care of it right now."
c. Collecting Evidence
The jury heard testimony that the Laredo Police Department has a traffic accident crash team comprised of ten officers that respond to motor vehicle accidents with severe bodily injuries or fatalities. Each of the officers has specific duties including taking photographs, taking measurements, diagraming the scene, interviewing witnesses, collecting videos from security cameras, and securing evidence. Several of the officers testified and offered photographs and measurements. Investigator Luis Raines, a certified data crash specialist and accident reconstructionist, testified regarding the results of the overall investigation.
Investigator Raines began by explaining the difference between gouge marks-the indentions made in the pavement when two objects collide-and skid marks-the markings on the pavement when brakes are applied, lock up, and leave an imprint on the pavement. He further explained how the measurements, pictures, and videos are used to determine the speed of vehicles, the departure angles when the vehicles collide, the position in which the vehicles land, and the vehicles' resting points.
With respect to this accident, Investigator Raines testified the evidence showed the Hummer did not leave any skid marks, which meant Venegas did not apply his brakes prior to impact with Ramos's vehicle. The officer further described a "back-distributed impact, equally distributed *344 across the rear of the vehicle." The Hummer hit the Aveo hard enough, with enough speed, "that it made the front hood buckle." Investigator Raines testified that based on several factors, including a real-time video-recording taken shortly before impact, he estimated the Hummer was traveling at sixty-six miles per hour, pre-impact. The damage to the Aveo was so severe, it was difficult to determine the vehicle's make and model.
Because Venegas told officers someone else was driving the vehicle, the State had to prove Venegas was the individual behind the wheel of the Hummer at the time of the accident. While Investigator Raines was determining the cause of the accident, Investigator Sanchez and Sergeant Claudia Gonzalez began collecting blood samples from the Hummer and the Grand Prix. From the Hummer, samples were taken from the steering wheel, gear shift, and top of the middle console. From the Grand Prix, samples were taken from the front passenger door handle, outside door handle, and the inside front passenger door side panel. At trial, Bexar County Forensics Specialist Erin Reat testified that Venegas could not be excluded as the donor from all samples with the exception of the outside door handle; she explained that was because the laboratory had been unable to obtain a genetic profile for the sample obtained from the outside door handle. With regard to the remaining blood samples, Reat testified that Venegas was one "in 54.76 quintillion individuals" that would be expected to provide that genetic profile.
d. Rosalinda Ramos
The jury also heard testimony regarding the injuries suffered by Rosalinda Ramos. Fifty-seven-year-old Ramos, a caregiver at a twenty-four-hour residential center, was active and healthy prior to the accident and worked the evening before the accident from midnight to 8:00 a.m. Her daughter, Carolina, stayed at a friend's house, and Ramos was on her way to pick her up at the time of the accident. The last thing Ramos remembers is stopping at the intersection; the next memory she has is waking up in the hospital and seeing her son, Carlos.
Ramos suffered a collapsed lung, pneumonia, and pulmonary disease ; nine broken ribs; she also had a tracheotomy to help her breath. Ramos is paralyzed from the lower abdomen down; her doctors told her that she will never walk again. Her recovery is very painful. She spent two months in the hospital and six months at a rehabilitation center. They had to do a colostomy ; Ramos testified that she is mortified that her children must change it.
I would tell my son that I wanted to die. That I did not want to continue living like this. What for? Just giving some trouble. That I wasn't going to be able to do anything. And I would say that, why would God have sent me this (crying) if I was a good person. I wouldn't harm anybody. Why? Why, I do everything right. I don't harm anyone. I don't do any wrongful.
During the victim's testimony, defense counsel raised a defensive theory that the victim was impaired by having either Xanax or Valium in her system. When the defense was unable to locate the hospital's doctor the following morning, defense counsel sought a continuance "so that we can be able to get a doctor." Making a finding, on the record, that the defense had been in possession of Ramos's medical records for over a year, the trial court denied the motion for continuance.
2. Jury Deliberations
On May 20, 2016, after Ramos testified, Venegas's wife and brother testified. Prior to the charge being read, Venegas changed *345 his punishment election; he elected that in the event the jury found him guilty, that the trial court would assess punishment. The trial court read the jury charge, the attorneys made their closing arguments, and the jury was escorted to the jury room to begin their deliberations. The trial court subsequently excused the parties for lunch.
Approximately seventy-five minutes into jury deliberations, the jury sent the judge a note requesting to view security videos taken from the gas station. Venegas was not present in the courtroom. Defense counsel assured the trial court that Venegas was told to be back by that time. "Because of technical limitations [ ] in the jury room," the trial court proceeded to show the videos in the courtroom. The trial court specifically instructed the jury, "You are not to deliberate in our presence.... I don't want you to communicate to each other regarding deliberations."
Approximately seven hours after the jury began deliberations, the jury returned a verdict of not guilty on the State's charge of intoxication assault and guilty verdicts against Venegas on both the failure to stop and render aid and the aggravated assault causing serious bodily injury. The jury also made an affirmative finding on Venegas's use of deadly weapon either during the commission of the offense or during the immediate flight therefrom. Venegas was still not present in the courtroom. The jury was released.
C. Punishment Phase
On May 23, 2016, the matter was recalled for punishment. Venegas did not appear. The trial court made an affirmative finding that Venegas voluntarily absented himself and proceeded with the punishment hearing.
The State called ten witnesses. Defense counsel called Venegas's wife. The State and defense counsel made closing arguments. Defense counsel argued that Venegas did not wake up the morning of January 1, 2014 and intend to harm Rosalinda Ramos. His actions were reckless. But he did not intend to harm anyone. He implored the trial court to look at Venegas as a whole-to look at his children, his work, his life, his faith.
The trial court assessed punishment at five-years' confinement in the Institutional Division of the Texas Department of Criminal Justice on the failure to stop and render aid charge, and twenty-years' confinement on the aggravated assault causing serious bodily injury charge. The trial court sentenced Venegas in absentia. On June 8, 2016, the trial court signed an interim judgment indicating that sentence "has not yet been imposed" and "has not yet commenced" because Venegas has voluntarily absented himself during the trial.
On July 20, 2016, Venegas was arrested. He was brought before the trial court on July 21, 2016. The trial court explained to Venegas it had already sentenced him in absentia on May 23, 2016.
Trial Court: I want to put it on the record and sentence you directly.
Okay. I give you-I've given you an opportunity to provide-to provide your statement to the Court. And I've considered it together with the testimony that I heard at the sentencing hearing in your absence. And together with all of that, despite the fact that you feel that it is your opinion that 20 years is a lot, Mr. Venegas, the injuries that the victim suffered are life-are for life.
Venegas: I understand.
Trial Court: Okay.
Venegas: But I-I'm sorry. It was-that's why I wanted to help her. I mean I'm no good to her in prison. She's going to need help.
*346 Trial Court: I also want to place on the record that I granted [trial counsel's] request to withdraw as attorney of record on June 14th. He was present on May 23rd when I sentenced you. Okay.
Venegas: Can I get another attorney? I'm sorry or-
Trial Court: I'll entertain those-those motions later.
Consistent with my sentence on May 23rd, I hereby sentence you for failure to stop and render aid to five years and for aggravated assault causing serious bodily injury for 20 years. The Court does find that you used a deadly weapon in committing that offense. Both cases will run concurrent. You are ordered to pay court costs in the amount of $1,143. You will receive credit for time served against towards [sic] your costs and your sentence.
The trial court pronounced punishment consistent with the punishment sentenced in absentia on May 23, 2016 and the interim judgment on June 8, 2016. The final judgment was signed by the trial court on July 21, 2016.
On appeal, Venegas raises four issues: (1) the computer-generated animation of the accident was unreliable because it was based on estimates and not actual measurements; (2) the trial court erred in denying Venegas's motions for continuance; (3) the evidence was legally insufficient to support the jury's verdict of aggravated assault based on Venegas's driving "too fast;" and (4) the trial court erred in pronouncing sentence, a critical stage of the trial, without providing Venegas assistance of counsel.
We turn first to Venegas's contention that the trial court erred in admitting the computer-generated animation of the accident.
ADMISSION OF COMPUTER ANIMATION
A. Standard of Review
An appellate court reviews a trial court's admission of evidence under an abuse of discretion standard. Henley v. State , 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016) ; see also Casey v. State , 215 S.W.3d 870, 879 (Tex. Crim. App. 2007) ; Page v. State , 137 S.W.3d 75, 78 (Tex. Crim. App. 2004). The trial court does not abuse its discretion by admitting evidence unless the court's determination lies outside the zone of reasonable disagreement. Henley , 493 S.W.3d at 83 (citing Moses v. State , 105 S.W.3d 622, 627 (Tex. Crim. App. 2003) ); accord Druery v. State , 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) ; Casey , 215 S.W.3d at 879.
B. Arguments of the Parties
Venegas contends the computer-generated animation of the crime scene offered by the State was based on estimations and mere speculation; the exhibit was inadmissible because it was not an accurate depiction of what occurred on the day in question.
The State counters that Investigator Raines testified the animation was created based on his expertise and personal observations, not speculation and was, therefore, admissible as substantive evidence.
C. Computer Animated Evidence
Our sister court addressed this very issue in Lewis v. State , 402 S.W.3d 852, 863, 64 (Tex. App.-Amarillo 2013), aff'd , 428 S.W.3d 860 (Tex. Crim. App. 2014) (reviewing a 120-second "computer generated three-dimensional ("3-D") time lapse animation that purportedly reconstructs events surrounding [a] shooting, as viewed from [a witness's] perspective, ... from the bedroom window of [the witness's]
*347 apartment and then from [the witness's] front door"). The court explained,
"A computer animation is merely a series of images generated by a computer that serves as demonstrative evidence. It may, for example, illustrate what a witness saw, demonstrate for the jury the general principles that underlie an expert opinion, or depict an expert's theory of how an accident occurred. In each such instance, the evidence may be authenticated by the witness's testimony that the computer animation presents a fair and accurate depiction ... [of] what they purport to represent. If they do not, they will not be admissible."
Id. at 864 (alterations in original) (quoting Steven Goode, The Admissibility of Electronic Evidence , 29 REV. LITIG. 1, 10 (Fall 2009) ); see also Mendoza v. State , No. 13-09-0027-CR, 2011 WL 2402045, at *15 (Tex. App.-Corpus Christi June 9, 2011, no pet.) (mem. op., not designated for publication) (noting "[d]iagrams are generally admissible to explain the testimony of a witness").
The Lewis Court distinguished the facts in its case, the animation was created based on the actions of four different people-made "[w]ith respect to animations involving animate objects," Lewis , 402 S.W.3d at 864, with that of Murphy v. State , No. 11-10-0150-CR, 2011 WL 3860444 (Tex. App.-Eastland Aug. 31, 2011, no pet.) (mem. op., not designated for publication). In Murphy , the officer testified he was a certified police officer, assigned to the traffic division and "his duties included investigating accidents and conducting accident reconstructions." Id. at *1. The officer further testified regarding his training, the specific steps he took, and his office's use of a computer program that allowed for computer-animated drawing of a traffic scene. Id. The officer testified in detail that the information entered into the computer-animated drawing was based on information provided by accident investigators. Id. In Murphy , the officer
explained that the animation is to scale with respect to the streets and lanes of traffic, but not as to surrounding buildings and other aspects of the surrounding environment. He characterized the images on the animation as a fair and accurate representation of the traffic collision ... [and] noted that all the information and assumptions used to create the animation were supplied either by him or other officers.... [T]he animation shows, based upon distance and speed traveled, how much ground is being covered in a given period of time.
Id.
When a staged, re-enactment involves human beings, it is "impossible to duplicate ... every minute detail and [is] therefore inherently dangerous [and] offer[s] little in substance and the impact of re-enactments is too highly prejudicial to insure the State or the defendant a fair trial." Lewis , 402 S.W.3d at 864-65 (quoting Miller v. State , 741 S.W.2d 382, 388 Tex. Crim. App. 1987) ). On the other hand, when an animation is based on inanimate objects and quantifiable measurements, "the factual discrepancies depicted [do] not cause the probative value of the evidence to be substantially outweighed by any unfair prejudice from its admission." Id.
D. Analysis
Here, Investigator Raines testified regarding his expertise as a police officer, traffic officer, certified data crash specialist, accident reconstructionist, and collision investigator. He also testified regarding Laredo Police Department's vehicle accident crash team consisting of ten officers that respond to any accident with severe bodily injuries or fatalities. Investigator *348 Raines explained that each of the officers is assigned specific duties including taking pictures, taking measurements, diagramming the scene, interviewing witnesses, and securing evidence. Investigator Raines is also certified in the use of a computer program called "total station" that assists in creating a diagram of a crime scene. He testified that program utilizes entered measurements to calculate speed, departure angles from the collision, how the vehicles ended, and the vehicles' "resting points." More specifically, the program creates formulas for energy, kinetic energy, and velocity. Investigator Raines further testified that the information he used was provided to him by members of the crash team. Additionally, the information used in creating the computer animation, the diagram, and the videotape, were based on a constant-time and distance-both of which were calculated from the video.
In this case, the video-recording used for the reconstruction came from a camera, located at the gas station on the corner of McPherson Street and Fenwick Street, facing the street, in a northbound direction. From the video-recording, Investigator Raines could identify several known buildings and angles. Additionally, because the videotape was taken in real-time, shortly before the accident, Investigator Raines was able to determine the speed at which Venegas was traveling on January 1, 2014 at 8:30 a.m. Investigator Raines could testify, simply by viewing the video-recording, in comparison to other vehicles, that the Hummer "was traveling in an excessive speed." Although both the Hummer and the Aveo were seen on the recording, the accident was out of the camera's view. Using the telephone pole and the stoplight, and a time-distance formula, Investigator Raines was able to determine that immediately prior to impact, Venegas was traveling at sixty-six miles per hour.
Based on the testimony presented, the computer animation was based on calculations derived from inanimate objects and quantifiable measurements. See Murphy , 2011 WL 3860444, at *1 ; Mendoza , 2011 WL 2402045, at *15 ; cf. Lewis , 402 S.W.3d at 864-65. We, therefore, conclude the trial court did not abuse its discretion in concluding any potential unfair prejudice resulting from the admission of the computer animation was not substantially outweighed by exhibit's probative value. See Lewis , 402 S.W.3d at 864.
Accordingly, we overrule Venegas's complaint regarding the computer-animated exhibit and turn to his appellate issues regarding his motions for continuance.
MOTIONS FOR CONTINUANCE
A. Standard of Review
"We review a trial court's ruling on a motion for continuance for abuse of discretion." Gallo v. State , 239 S.W.3d 757, 764 (Tex. Crim. App. 2007) (citing Janecka v. State , 937 S.W.2d 456, 468 (Tex. Crim. App. 1996) ).
B. Arguments of the Parties
Venegas argues the trial court erroneously denied his motion for continuance sought for the purpose of allowing his expert, William Greenlees, to review the accident report provided by the State in March of 2016, and for the doctor who failed to show on the State's subpoena.
The State counters that Venegas failed to show surprise as required as a basis for an abuse of discretion.
C. Motions before the Trial Court
Venegas complains about two different motions for continuance denied by the trial court. We set them out separately.
1. Accident Reconstruction Expert *349 The day before the start of testimony, May 16, 2016, defense counsel sought a thirty-day continuance for his accident reconstruction expert to conduct his own independent calculations. Defense counsel explained that the State provided the accident reconstruction report to the defense in March of 2016, two years and three months after the accident, and less than sixty-days prior to trial. The first time defense counsel was able to meet with his expert was on May 14, 2016; not only was the expert not able to play the video, but the expert reported that the documentation he needed to recreate many of the calculations was not provided by the State. Additionally, on Friday afternoon, May 13, 2016, the State contacted defense counsel to provide notification that Investigator Raines had prepared a supplemental accident reconstruction report.
The State clarified the supplemental report was not new evidence, it was simply a "visual aid to help the jury understand those 13 pages of math, basically. It's an illustration of the report." The State reiterated it was not required to provide copies of anything in the report to defense counsel, but was doing so only as a courtesy. The State further explained that, although the accident reconstruction report was turned over in March of 2016, defense counsel had been in possession of the video since December 8, 2014.
But, Judge, we also gave him additional copies of that video on February 5th of 2015 and again on March 16th of 2015. Until the last time we were in court, that he asked Your Honor to help him set up a meeting with our office, we didn't know he couldn't see it. We've been making that-our office available for him. We've been doing more than we're required to do to give him multiple copies in whatever other formats we could get to make that video viewable to him.
Defense counsel requested more time for his expert to view the video, prepare independent calculations, and to view the animation. The State countered that on April 11, 2016, defense counsel asked for a continuance for the same reason and explicitly told the court that thirty days would be sufficient. "He said 30 days was plenty. You gave him five-five weeks, and we're here today all ready to go, and we're never even hearing that he wanted a continuance."
The trial court denied defense counsel's request for a continuance.
2. Emergency Room Doctor
During Ramos's testimony, there was some question whether she had either Xanax or Valium in her system at the time of the accident. As part of the State's case-in-chief, Ramos's medical records were already admitted in evidence. At the end of the third day of trial, and after the State rested, defense counsel told the trial court that he intended to rely on the State's subpoena to call the emergency room doctor in support of the defensive theory that Ramos was impaired and support their argument of contributory negligence. Defense counsel had not, however, served the doctor with a separate defense subpoena. The State argued the doctor was subpoenaed for punishment purposes and defense counsel had not provided the State with notice of its intent to use him as an expert witness during the guilt-innocence phase of the trial. The trial court overruled the State's objection. "For the record, I'm going to allow the doctor to testify."
The following morning, on May 20, 2016, defense counsel reported they had been unable to locate the doctor. The State confirmed the doctor was served, but noted that the subpoena was dated for May 16, 2016. Defense counsel motioned for a "formal motion for continuance based on the *350 fact that we would like to find another doctor to be able to testify in the medical records that have been introduced by the State.... [W]e're requesting a continuance till Monday so that we can be able to get a doctor." Reiterating that the defense had been in possession of the medical records for over a year , the trial court denied the motion for continuance.
D. Preservation of Error
Texas Code of Criminal Procedure article 29.03 provides, "A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." TEX. CODE CRIM. PROC. ANN . art. 29.03 (West 2006) (emphasis added); accord Blackshear v. State , 385 S.W.3d 589, 590-91 (Tex. Crim. App. 2012) ("[I]f a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal.") (quoting Anderson v. State , 301 S.W.3d 276, 279 (Tex. Crim. App. 2009) ). Likewise, article 29.08 provides, "All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance." TEX. CODE CRIM. PROC. ANN . art. 29.08 ; Anderson , 301 S.W.3d at 279. In Anderson , the Texas Court of Criminal Appeals explained,
We have construed these statutes to require a sworn written motion to preserve appellate review from a trial judge's denial of a motion for a continuance. Thus, if a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal.
Anderson , 301 S.W.3d at 279 (footnote omitted); accord Blackshear , 385 S.W.3d at 591. The Blackshear Court reiterated the need for a written motion and "explicitly refused to recognize a due process exception to the rule requiring motions for continuances to be written and sworn in order to be preserved on appeal." Blackshear , 385 S.W.3d at 591 (citing Anderson v. State , 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) ) (refusing to recognize a due process exception to the requirement that motion for continuance be written and sworn).
E. Analysis
Venegas's complaints about the trial court's denials of his motions for continuance are subject to procedural default. See TEX. CODE CRIM. PROC. ANN . art. 29.03 ; accord Blackshear , 385 S.W.3d at 591 ; Lewis v. State , No. 08-12-00151-CR, 2014 WL 644812, at * 3 (Tex. App.-El Paso, Feb. 19, 2014, no pet.) (not designated for publication). By failing to file a written, sworn motion for continuance, Venegas failed to preserve either of his complaints for his motions for continuance. Accordingly, we overrule both of issues regarding his motions for continuance.
We turn next to Venegas's assertion that the evidence is insufficient to support the charge of aggravated assault beyond a reasonable doubt.
SUFFICIENCY OF THE EVIDENCE
A. Standard of Review
In reviewing the sufficiency of the evidence, "we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Adames v. State , 353 S.W.3d 854, 860 (Tex. Crim. App. 2011) ; accord Gear v. State , 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). "This standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence...."
*351 Adames , 353 S.W.3d at 860 ; accord Gear , 340 S.W.3d at 746. The reviewing court must also give deference to the jury's ability "to draw reasonable inferences from basic facts to ultimate facts." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Id. (citing Johnson v. State , 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) ).
We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. King v. State , 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). We defer to the jury's responsibility to resolve any conflicts in the evidence fairly, weigh the evidence, and draw reasonable inferences. See Hooper , 214 S.W.3d at 13 ; King , 29 S.W.3d at 562. The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. See Hooper , 214 S.W.3d at 15 ; Young v. State , 358 S.W.3d 790, 801 (Tex. App.-Houston [14th Dist.] 2012, pet. ref'd). In conducting a sufficiency review, "[w]e do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure that the jury reached a rational decision." Young , 358 S.W.3d at 801.
B. Arguments of the Parties
Venegas contends the State's case is based on estimations that Venegas was speeding and driving too fast and that estimates are not sufficient to prove a case beyond a reasonable doubt.
The State counters that Venegas limits his sufficiency argument to one piece of evidence, the officer's computer animation, to prove one element-Venegas's excessive speed was reckless. The State argues that by doing so, Venegas ignores the rest of the State's evidence, the rest of Investigator Raines's testimony, and the remaining witnesses.
C. Aggravated Assault
Venegas was charged as follows:
[T]he defendant, Gerardo Venegas, did then and there intentionally, knowingly, or recklessly cause serious bodily injury to Rosalinda Ramos by causing a collision while driving a motor vehicle and failing to maintain speed that was reasonable or prevent under the circumstances then existing, or by driving a motor vehicle in a manner that disregarded the safety of other motorists on the road ...
The jury also made an affirmative finding that Venegas used or exhibited a deadly weapon, specifically an automobile, during the commission of the offense or during the immediate flight therefrom.
In this case, to obtain a conviction for aggravated assault, the State was required to prove beyond a reasonable doubt that Venegas intentionally, knowingly, or recklessly caused serious bodily injury to Ramos by failing to maintain a reasonable speed or driving in a manner that disregarded the safety of other motorists on the roadway. See TEXAS PENAL CODE ANN . §§ 22.01(a)(1), 22.02(a)(1) (West 2011 & Supp. 2017). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." Id. § 1.07(a)(8) (West Supp. 2017). "Serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Id. § 1.07(a)(46).
*352 D. Analysis
Although Venegas contends the State's computer animation evidence is insufficient to support that he was driving too fast, there was a plethora of other evidence to support Venegas's reckless behavior.
Border Patrol Agent Berlanga testified that he was northbound on McPherson, stopped at the traffic light, when he saw a black Hummer traveling southbound at a speed he estimated to be between eighty and a hundred miles per hour. Two or three seconds after the light turned green, he saw the Hummer "slam" into the back of a silver car. The impact was very loud causing "the entire back half of the car from the headrest to the seat to the rear end of the vehicle was completely gone." Although there was no question that the driver of the silver vehicle was injured, the driver of the Hummer did not stop. Agent Berlanga's wife and passenger "jumped out" to assist the driver and Agent Berlanga left in pursuit of the Hummer. Agent Berlanga's passenger, Santiago Rodriguez, testified that he noticed the Hummer because "that truck was just going way too fast;" and then, after he hit the silver vehicle, "[h]e just took off."
Investigator Raines testified there were no skid marks on the roadway which meant Venegas did not apply the brakes prior to his Hummer striking Ramos's vehicle. Investigator Raines also testified there were no signs at the accident scene that Venegas took any evasive action to avoid the crash. Ramos's vehicle was hit in the rear of the vehicle, with enough speed "that it made the front hood buckle." In addition to the computer animation offered through Investigator Raines, the State also relied on photographs taken by Sergeant De La Garza and Sergeant Gonzalez, and a real-time video taken from a security camera mounted on a gas station near the accident. The video does not show the point of impact, but does show both vehicles immediately before impact.
Officer Paredes testified that when Venegas arrived at booking he was "very belligerent, was very rowdy, he was just acting up, cursing at the officers, being very disrespectful, combative." Venegas also told officer Paredes "I'm drunk. Let's get this over with, whatever we are going to do. Let's go. Let's take care of it right now." Regardless of whether the jury believed the State proved intoxication assault, the jury could use Venegas's statements and behavior as evidence that Venegas drove his vehicle in a manner that disregarded the safety of other motorists.
Therefore, viewing "all of the evidence in the light most favorable to the verdict," see Adames , 353 S.W.3d at 860, and affording deference to all reasonable inferences to which a jury could have drawn, see Hooper , 214 S.W.3d at 13, we conclude the evidence is sufficient to support the jury's finding that Venegas intentionally, knowingly, or recklessly caused serious bodily injury to Rosalinda Ramos.
Lastly, we turn to Venegas's issue regarding the trial court's failure to provide him counsel during a critical stage of the trial.
LACK OF ATTORNEY AT JULY 21, 2016 SENTENCING
A. Arguments of the Parties
Venegas contends the trial court's failure to provide Venegas with counsel at the pronouncement of his sentence, a critical stage of the trial, rendered his trial inherently unfair and unreliable.
The State counters that Venegas voluntarily absented himself from the sentencing on May 23, 2016, when defense counsel was present. The trial court clearly stated *353 the action taken on July 21, 2016, was not a hearing. Because the trial court was simply announcing the sentence that was previously determined at the sentencing phase of the trial on May 23, 2016, the July 21, 2016 events were not a critical stage of trial and Venegas's substantial rights were not affected.
B. Determining Whether Pronouncement of Sentence is Critical Stage
1. Defining Critical Stage
"The United States Supreme Court has held, as a matter of federal constitutional law, that 'appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected.' " Cooks v. State , 240 S.W.3d 906, 910 (Tex. Crim. App. 2007) (quoting Mempa v. Rhay , 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) ). "[W]here a defendant is represented by counsel during trial, a rebuttable presumption [arises] that [trial] counsel continued to adequately represent the defendant during [a succeeding] critical stage." Id. (citing Oldham v. State , 977 S.W.2d 354, 360-63 (Tex. Crim. App. 1998) (discussing this rebuttable presumption) ). "Even when a defendant can rebut this presumption with evidence that he was deprived of adequate counsel during a critical stage, this deprivation of counsel is subject to a harmless error or prejudice analysis." Id. (citing Satterwhite v. Texas , 486 U.S. 249, 257, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (subjecting deprivation of right to counsel to harmless error analysis when deprivation did not contaminate "the entire criminal proceeding") ).
The Sixth Amendment right to counsel extends to all critical stages of the criminal proceeding, not just the actual trial. Gilley v. State , 418 S.W.3d 114, 120 (Tex. Crim. App. 2014). Not every event following the inception of adversarial judicial proceedings constitutes a "critical stage." Id. In determining whether an adversarial proceedings constitutes a critical stage, the court must determine whether the proceedings amount to a "trial-like confrontation" in which the accused required counsel's assistance "in coping with legal problems or ... meeting his adversary." Rothgery v. Gillespie County, Tex. , 554 U.S. 191, 212 n.16, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (internal citations omitted); accord Gilley , 418 S.W.3d at 120. Whether a particular event constituted a critical stage "is determined not by whether the defendant suffered prejudice by the absence of effective assistance of counsel during that part of the proceeding[ ], but rather, whether critical rights of a defendant can be lost at the stage in question." Medley v. State , 47 S.W.3d 17, 22 (Tex. App.-Amarillo 2000, pet. ref'd).
"[S]entencing is a critical stage of the criminal proceeding." Gardner v. Florida , 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). A sentence cannot stand if the defendant is totally deprived of the assistance of counsel at sentencing. See Perez v. State , 578 S.W.2d 753, 754 (Tex. Crim. App. 1979) (op. on reh'g). A defendant's criminal sentence is "comprised of two parts: (1) the oral pronouncement of the judgment in the presence of the defendant and (2) the [trial] court's written judgment and order for the judgment to be carried into execution." Meachum v. State , 273 S.W.3d 803, 804 (Tex. App.-Houston [14th Dist.] 2008, no pet.). A trial court's judgment is a written declaration of the sentence assessed against a defendant, signed by the trial court, and entered of record. See TEX. CODE CRIM. PROC. ANN . art. 42.01 § 1 (West 2018) ; accord Ex parte Madding , 70 S.W.3d 131, 135 (Tex. Crim. App. 2002) ;
*354 Wiedenfeld v. State , 450 S.W.3d 905, 907 (Tex. App.-San Antonio 2014, no pet.).
2. Sentencing in Absentia Versus Pronouncement of Sentence
With some exceptions, article 42.03 section 1(a) of the Texas Code of Criminal Procedure requires a defendant's sentence be pronounced orally in his presence. See TEX. CODE CRIM. PROC. ANN. art. 42.03 § 1(a) ; Taylor v. State , 131 S.W.3d 497, 500 (Tex. Crim. App. 2004). "[I]t is the pronouncement of sentence that is the appealable event, and the written sentence or order simply memorializes it and should comport therewith." Coffey v. State , 979 S.W.2d 326, 328 (Tex. Crim. App. 1998) ; accord Madding , 70 S.W.3d at 136 ("A defendant has a due process 'legitimate expectation' that the sentence he heard orally pronounced in the courtroom is the same sentence he will be required to serve."); see also Delbosque v. State , Nos. 05-04-01500-CR, 05-04-01501-CR, 05-01-01502-CR, 05-04-01503-CR & 05-04-01504-CR, 2006 WL 1102632, at *4 (Tex. App.-Dallas Sept. 27, 2006, pet. ref'd) (mem. op., not designated for publication) (although trial court sentenced appellant in absentia, appellate timetable did not begin to run until after appellant was apprehended and trial court pronounced sentence in his presence). Because the trial court has considerable discretion in sentencing, the court of criminal appeals has held that sentencing is a "stage of a criminal proceeding where substantial rights may be affected." Ex parte Vestal , 468 S.W.2d 372, 373 (Tex. Crim. App. 1971).
Broader principles are also at stake. For a trial court to orally pronounce one sentence to a defendant's face and then, outside the defendant's presence, sign a written judgment embodying a different and more severe sentence violates constitutional due process and fair notice. See Madding , 70 S.W.3d at 136. "A defendant has a due process 'legitimate expectation' that the sentence he heard orally pronounced in the courtroom is the same sentence that he will be required to serve." Id.
We conclude the pronounce of Venegas's sentence was a critical stage of the proceedings and Venegas was entitled to counsel. Because Venegas had counsel during the punishment hearing, and when the trial court sentenced Venegas in absentia, we conclude Venegas was deprived of counsel for part of the critical stage-the pronouncement-but not the entire critical stage-the punishment hearing. Absent proof that Venegas was deprived of counsel for the entire critical stage , he must show harm. See Perez , 578 S.W.3d at 754.
We find the Beaumont Court of Appeals analysis in Gardiner v. State , Nos. 09-16-00192-CR, 09-16-00196-CR, 2017 WL 2687476, at *2 (Tex. App.-Beaumont June 21, 2017, pet. ref'd) (mem. op., not designated for publication), instructive. The record shows that Gardiner's trial counsel was present when the trial court originally assessed and orally pronounced punishment. Id. Trial counsel did not raise any objections. Id. The trial court recessed to allow the prosecutor to prepare the written judgments; when the matter was recalled, Gardiner's counsel was not present. Id. The trial court proceeded, in trial counsel's absence. Id. The sentences announced were in "in accordance with the prior oral pronouncement that the trial court made when Gardiner's attorney was present." Id. The court concluded Gardiner was deprived of counsel for some, but not all, of the sentencing stage, and was therefore required to show harm. Id.
3. Voluntary Absence *355 When an individual's freedom is at risk, our Rules of Criminal Procedure require a defendant be present when the State presents a case against him at trial. See TEX. CODE CRIM. PROC. ANN. art. 33.03 (West 2006). Yet, "when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion." Id. ; accord Miller v. State , 692 S.W.2d 88, 90 (Tex. Crim. App. 1985) ; Staten v. State , 328 S.W.3d 901, 905 (Tex. App.-Beaumont 2010, no pet.). Absent evidence to the contrary, an appellate court will uphold a trial court's determination that a defendant voluntarily absented himself from the proceedings. See Moore v. State , 670 S.W.2d 259, 260-61 (Tex. Crim. App. 1984). ("Absent any evidence from the defendant to refute the trial court's determination that his absence was voluntary, we will not disturb the trial court's finding."); see also Kline v. State , 737 S.W.2d 895, 900 (Tex. App.-Houston [1st Dist.] 1987, pet. ref'd) (judging voluntariness of defendant's absence in hindsight).
C. Analysis
In the present case, prior to the start of evidence, Venegas elected to have the jury assess punishment. On the last day of trial, Venegas changed his election to have the trial court assess punishment. Although Venegas was present for all of the evidence presented during the guilt-innocence phase of the trial, he absconded during jury deliberations on guilt-innocence. In Venegas's absence, the jury returned a guilty verdict on the charge of aggravated assault causing serious bodily injury and the charge of failure to stop and render aid. The trial court recessed the proceedings for the weekend.
1. Punishment Phase
On Monday, when Venegas did not appear, the trial court made an affirmative finding that Venegas was voluntarily unavailable and the trial court proceeded to punishment in Venegas's absence. Although Venegas had absconded, he continued to be represented by defense counsel. In his absence, the trial court heard from eleven individuals. Defense counsel argued for leniency; he acknowledged the jury's verdict, but pleaded with the trial court to consider all of the circumstances-Venegas's background, his work ethic, his children, and his faith. Defense counsel urged the trial court to realize this was not the situation where "somebody got up and planned to go and commit some robbery.... It was a reckless ... it wasn't something that was done intentionally." The record supports that the trial court considered all of the evidence and the arguments of counsel prior to announcing Venegas's sentence on May 23, 2016. See Fife v. State , No. 05-16-00094-CR, 2017 WL 2351083, at *4 (Tex. App.-Dallas May 31, 2017, no pet.) (mem. op., not designated for publication).
2. Venegas Sentenced in Absentia
The trial court made the following statements on the record:
On Friday, May 20th, on this case, the jury came back with their verdict, finding Gerardo Venegas guilty of aggravated assault, guilty of failure to stop and render aid and not guilty for intoxication assault. With respect to the two findings of guilt by the jury, the Court hereby accepts their verdict and finds Gerardo Venegas guilty for aggravated assault and guilty for failure to stop and render aid.
....
The jury [also] made a finding and part of their verdict they found that Gerardo Venegas did use or exhibit a *356 deadly weapon during the commission of the offense.
Following a punishment hearing, the trial court assessed punishment at five years' confinement in the Institutional Division of the Texas Department of Criminal Justice on the jury's verdict of failure to stop and render aid and twenty years' confinement on the jury's verdict of aggravated assault causing serious bodily injury. The sentence was assessed in Venegas's absence, but imposition of the sentence was suspended pending Venegas's apprehension. The trial court signed an interim judgment on June 8, 2016.
3. Pronouncement of Sentence
On July 20, 2016, Venegas was apprehended; the matter was called before the trial court the following day. Venegas told the trial court that he left because he was "scared." The following exchange occurred:
Trial court: I've already sentenced you in absentia. You weren't present on May 23rd and I proceeded to the sentencing. But because now you've been captured and now you're present, I want to put it on the record and sentence you directly.
Okay. I give you-I've given you an opportunity to provide-to provide your statement to the Court. And I've considered it together with the testimony that I heard at the sentencing hearing in your absence. And together with all of that, despite the fact that you feel that it is your opinion that 20 years is a lot, Mr. Venegas, the injuries that the victim suffered are life-are for life.
Venegas: I understand.
Trial Court: Okay.
Venegas: But I-I'm sorry. It was-that's why I wanted to help her. I mean I'm no good to her in prison. She's going to need help.
Trial Court: I also want to place on the record that I granted [trial counsel's] request to withdraw as attorney of record on June 14th. He was present on May 23rd when I sentenced you. Okay.
Venegas: Can I get another attorney? I'm sorry or-
Trial Court: I'll entertain those-those motions later.
Consistent with my sentence on May 23rd, I hereby sentence you for failure to stop and render aid to five years and for aggravated assault causing serious bodily injury for 20 years. The Court does find that you used a deadly weapon in committing that offense. Both cases will run concurrent. You are ordered to pay court costs in the amount of $1,143. You will receive credit for time served against towards [sic] your costs and your sentence.
4. Harm Analysis
We note that "[a] trial court does not have the statutory authority or discretion to orally pronounce one sentence in front of the defendant, but enter a different sentence in his written judgment, outside the defendant's presence." Madding , 70 S.W.3d at 136. Nothing in the record suggests the trial court intended to change the written judgment. The sentence pronounced on July 21, 2016 was identical to that announced in Venegas's absence on May 23, 2016 and in the written interim judgment signed on June 8, 2016.
Venegas's defense counsel had already cross-examined the State's witnesses, and presented the trial court with a compelling argument regarding sentencing, in an attempt to mitigate the State's evidence. The record is silent regarding anything that having counsel present during the pronouncement of the sentence would have *357 changed. The sentences in the written verdict returned by the jury, the sentence orally pronounced in the presence of Venegas's counsel, and the sentence pronounced in Venegas's presences were identical. See Gardiner , 2017 WL 2687476, at *2 ("Because the sentences in the written judgments are identical to those orally pronounced by the court when [the defendant's] attorney was present, we conclude that [the defendant] has failed to show harm."). In fact, Venegas does not even suggest how his lack of counsel at the pronouncement of his sentence resulted in harm. We further note that, to allow Venegas the right to a new sentencing hearing, and an opportunity for new counsel to make new arguments to the trial court-a proverbial second bite at the apple-would be tantamount to rewarding Venegas's behavior in absenting himself from the proceedings.
Because Venegas failed to show harm, we overrule his last issue on appeal.
CONCLUSION
Having overruled each of Venegas's issues on appeal, we affirm the trial court's judgment.